## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**IN RE: JOCEYLN K. DOKES, Debtor**                      No. 4:15-bk-13795
                                                                     **Chapter 7**


**ARVEST BANK**                                                        **PLAINTIFF**

**v.**                                **4:16-ap-1049**


**JOCELYN DOKES**                                                     **DEFENDANT**


### OPINION AND ORDER DENYING CHAPTER 7 DISCHARGE


On May 23, 2016, Arvest Bank [Arvest] filed its complaint objecting to the debtor's discharge pursuant to 11 U.S.C. § 727(a)(2) and (a)(4)(A) and seeking a determination that certain debts owed to Arvest are nondischargeable under 11 U.S.C. § 523(a)(2)(A). On June 14, 2016, the debtor filed an answer to Arvest's complaint. The Court held a trial beginning on January 19, 2017, and concluding on January 20, 2017. Lyndsey D. Dilks appeared on behalf of the debtor. Branch T. Fields appeared on behalf of Arvest. At the conclusion of the trial, the Court granted Arvest's request for the parties to submit post-trial briefs in lieu of closing arguments. Upon receipt of the parties' respective briefs on February 10, 2017, the Court took the matter under advisement. For the reasons stated below, the Court finds that Arvest proved by a preponderance of the evidence that the debtor is not entitled to a discharge under § 727(a)(2) and (a)(4)(A). Therefore, the Court denies the debtor's discharge.[1]

---

[1] Because the Court denies the debtor's discharge, Arvest's cause of action under § 523(a)(2)(A) is moot.

**Jurisdiction**

The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J). This order contains findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

**Background**

Since 1997, the debtor has owned and operated several businesses in North Little Rock, Arkansas. In addition to running her diverse businesses–enumerated below in section I. together with the debtor's corporations–the debtor has taken business classes and is a licensed real estate agent. In 2004, the debtor paid approximately $100,000.00 to purchase four acres and a building located at 1400 145th Street, North Little Rock, Arkansas [the 145th Street property]. She has used the building as a warehouse, nightclub, and event center. In 2006, one of the debtor's four corporations, Red Barn, Inc. [Red Barn], bought six acres adjacent to the 145th Street property [the Dineen property]. The debtor used the Dineen property as overflow parking for the nightclub and event center. On April 14, 2014, the debtor transferred the 145th Street property to her adult daughter, Talesha Dokes [Talesha], a graduate student residing in Michigan. The same day, acting as Red Barn's president, the debtor also transferred the Dineen property to Talesha. At the time of the transfers, both properties were unencumbered.[2] The debtor filed her first chapter 13 case two days later, on April 16, 2014. Her first case was dismissed on January 9, 2015, for failing to make plan payments. She filed her second chapter 13 case–later converted to a chapter 7–on July 31, 2015. In both cases, the debtor failed to disclose the transfers to her daughter and omitted several assets from her schedules, including an inherited interest in 1217 East 15th Street, a liquor license, her real estate license and income, rental income, two bank accounts, and her ownership

---

[2] According to Kelly Rather, Arvest's special assets coordinator, the county tax records currently value the 145th Street property at $250,100.00 and the Dineen property at $42,000.00. Rather testified that tax records generally undervalue property. Trial Tr. vol I, 34-35, Jan. 19, 2017.

2

interests in the four corporations.

### I.    The debtor's corporations

On the date of each of the debtor's bankruptcy filings, the debtor was the sole

shareholder of four corporations:

(1)    Dokes Quality Auto Sales, Inc. [Dokes Auto][3]
  - •    formed in 1997
  - •    debtor was president as recently as 2011[4]
  - •    owner of car dealership (Dokes Quality Auto Sales) and property located at 2500 East Broadway, North Little Rock

(2)    JNYLECO, Inc. [JNYLECO][5]
  - •    property management company formed in 2001
  - •    debtor is president
  - •    owns rental properties at 10 Goodwin Circle and 112 Prairie View Drive in North Little Rock, Arkansas[6]

(3)    Jocelyn's Grille, Inc. [Jocelyn's Grille] d/b/a Xclusive of Little Rock f/k/a Red Barn, Inc.[7]

---

[3]  The debtor filed an *Amendment to Petition* on February 8, 2016, asserting that she was the sole shareholder of Dokes Auto.  However, on January 18, 2017, the debtor filed an amended Statement of Financial Affairs [SOFA], representing that she owned 50% of Dokes Auto.  At trial, the debtor testified that she transferred part of her interest in Dokes Auto to Talesha in 2014 prior to filing her first bankruptcy case on April 14, 2014.  According to the debtor, Talesha has owned 50% of Dokes Auto since 2014.  Although Talesha testified at trial, she could not say with specificity when she obtained an interest in Dokes Auto and did not know the extent of her interest.  Regardless, it is undisputed that at the time the debtor filed each of her bankruptcy cases, she owned at least 50% of Dokes Auto.

[4]  The debtor executed loan documents on behalf of Dokes Auto in her capacity as its president on January 24, 2011.  (Pl. Ex. 1.)

[5]  JNYLECO is sometimes identified as "JYNLECO" or "JYNELCO" in exhibits introduced at trial.

[6]  JNYLECO owned a third rental property located at 704 W. 18th Street that was condemned and razed by the City of North Little Rock.

[7]  Although the debtor filed documents with the Arkansas Secretary of State in 2008 to change the name of this corporation from Red Barn, Inc. to Jocelyn's Grille, Inc.,

- •    from 2006 to April 14, 2014, this entity owned the Dineen property
- •    debtor obtained interest in this entity in 2005
- •    debtor is president
- •    debtor personally holds liquor license used by this entity

(4)   Lending Hand Foundation
- •    non-profit back to school donation center
- •    formed in 2010

## II.    Arvest's loans to the debtor and Dokes Auto

Arvest's involvement with the debtor arises from two loans, each involving the debtor and one of her corporations. The first loan originated on September 16, 2005, when the debtor borrowed $40,000 from Arvest [debtor's personal loan]. As security for the debtor's personal loan, JNYLECO mortgaged three of its properties to Arvest: 10 Goodwin Circle, 112 Prairie View Drive, and 704 West 18th Street. The debtor, acting in her capacity as JNYLECO's president, executed the mortgage on behalf of JNYLECO. The debtor did not repay the loan when it matured and became due on March 16, 2013. The second loan originated on January 24, 2008, when Dokes Auto borrowed $245,000 from Arvest [Dokes Auto loan]. The Dokes Auto loan was secured by its property at 2500 East Broadway. The debtor, who was president of Dokes Auto at the time, executed the loan on behalf of the corporation and also personally guaranteed the loan. Pursuant to a debt modification agreement dated January 24, 2011, the Dokes Auto loan matured on January 24, 2014. Arvest received a payment on the Dokes Auto loan in February 2014, but neither Dokes Auto nor the debtor made any further payments on the loan.

## III.    The debtor's first chapter 13 case

On April 14, 2014, the debtor consulted attorney John Phillips about filing bankruptcy. As part of the consultation, the debtor filled out a client information form [intake form] provided by Phillips's office. (Def. Ex. A.) On the intake form, the debtor listed her employer as Quality Auto Sales and stated that her job title was "manager." She

_____

the parties referenced this entity by both names at trial.

indicated on the form that she had been employed by Quality Auto Sales for ten years. However, she did not disclose an ownership interest in Dokes Quality Auto Sales, Inc. nor did she disclose her sole ownership of three other corporations.  To the contrary, in response to a question on the form asking whether the debtor owned "any stocks (either publicly traded or closely held) or bonds" the debtor marked the box next to "no" and left blank the space provided to describe "the stocks/bonds, your number of shares and who manages them, or if of a business that you own, please describe the business."  Similarly, the debtor did not provide an answer to the question "do you drive or have in your possession a vehicle/boat/ATV/etc [sic] that belongs to someone else (describe)."  She also did not provide any information in response to the form's directive to "please list any real property or time shares you own other than the home you live in."  In response to the question "have you transferred or sold any Real Property (land) in the last three years, Phillips's assistant–not the debtor–checked the box next to "yes" and wrote "Commissioner Land Sale" of property located at "1400 145 St. Wrightsville 72206." No other transfers were disclosed on the intake form.

The same day that she consulted Phillips about filing bankruptcy–April 14, 2014–the debtor drafted a pair of quitclaim deeds that transferred two unencumbered properties to Talesha.  The first deed transferred the 145th Street property from the debtor to Talesha; the second transferred the Dineen property from Red Barn, Inc. to Talesha.[8]  The deeds transferring the properties to Talesha were recorded on April 16, 2014.[9]  (Pl. Ex. 15.) Later the same day–April 16, 2014–the debtor, through Phillips, filed her first chapter 13 case.  On Schedule A, the debtor asserted ownership of five properties that she described

---

[8]  Although Red Barn, Inc. changed its name to Jocelyn's Grille, Inc. in 2008, the corporation ostensibly held the Dineen property in its former name at the time of the transfer.

[9]  As discussed later in section V., the debtor recorded a second set of deeds on June 3, 2014, purporting to transfer the 145th Street property from herself to DM of NLR, LLC and the Dineen property from Red Barn, Inc. to DM of NLR, LLC–despite having already transferred these properties to Talesha.

and valued as follows:

(1)     Home at 6 Cedar Creek Ct–NLR
        value of debtor's interest $177,550.00; secured claim $121,583.64

(2)     Commercial property at 2500 East Broadway St.–NLR (lots 1,2,3)
        value of debtor's interest $324,550.00; secured claim $258,952.02

(3)     Rental Home at 112 Prairie View Dr.–NLR
        value of debtor's interest $50,950.00; secured claim $0.00

(4)     Rental Home at 10 Goodwin Cir.–NLR
        value of debtor's interest $47,350.00; secured claim $0.00

(5)     Rental Home at 2500 E. 2nd St.–NLR
        value of debtor's interest $86,950.00; secured claim $0.00[10]

On April 23, 2014, the debtor filed Schedules I and J and her Statement of Financial Affairs [SOFA]. On Schedule I, the debtor stated that she was employed as the manager of Quality Auto Sales, but listed no wages, salary, or commission derived from her employment. Rather, she stated that her sole monthly net income was $3750.00 received "from rental property and from operating a business, profession, or farm." The debtor listed no income from being a real estate agent. The second paragraph of the debtor's April 23, 2014 SOFA instructed that

> Questions 1-18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19-25. **If the answer to an applicable question is "None," mark the box labeled "None."**

Question 1 of the SOFA asked the debtor to

> State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities, either as an employee or independent trade or business, from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year.

---

[10] In actuality, the debtor had no interest in three of the scheduled properties–Dokes Auto owned 2500 East Broadway and JNYLECO owned 112 Prairie View Drive and 10 Goodwin Circle.

6

In response to Question 1, the debtor stated:

| | |
|---|---|
| $0.00 | 2012 Income (gathering) |
| $0.00 | 2013 Income (gathering) |
| $5,550.00 | 2014 Income to date |

Question 2 of the SOFA required the debtor to

> State the amount of income received by the debtor other than from employment, trade profession, or operation of the debtor's business during the **two years** immediately preceding the commencement of this case.

In response to Question 2, the debtor answered:

| | |
|---|---|
| $0.00 | 2012 Rental Income (gathering) |
| $0.00 | 2013 Rental Income (gathering) |
| $7600.00 | 2014 Rental Income to date |

Question 10 of the SOFA required the debtor to

> List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case.

In response, the debtor marked the box labeled "None." Question 14 required the debtor to "List all property owned by another person that the debtor holds or controls." In response, the debtor marked the box labeled "None." Question 18 instructed the debtor to

> list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full or part-time within **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case.

In response to Question 18, the debtor marked the box labeled "None." Although the debtor had filed a chapter 13 plan proposing to pay $2520.00 per month, she failed to make even one plan payment in the five months that her case was pending. As a result,

7

the Court dismissed the debtor's first case on September 4, 2014.

### IV.    The debtor's second chapter 13 case

On January 30, 2015, Arvest filed suit in state court against several defendants, including the debtor, Dokes Auto, and JNYLECO to foreclose on the collateral securing the Dokes Auto loan and the debtor's personal loan–specifically, Dokes Auto's property at 2500 East Broadway and JNYLECO's property at 112 Prairie View Drive and 10 Goodwin Circle.  Attorney Everett Martindale represented the debtor, Dokes Auto, and JNYLECO in the state court litigation with Arvest.  On July 31, 2015, the debtor, represented by Martindale this time, filed her second chapter 13 case.

Schedule A in the debtor's second case disclosed the same properties as her prior case, with the exception of 6 Cedar Creek Court.[11]  However, while the debtor had stated equity in the four properties totaling approximately $250,847.98 in her prior case, she represented in her second case that she was underwater by $38,402.00 on the same properties.  Schedule A reflected the following property values and secured debts:

(1)    Commercial property at 2500 East Broadway St.–NLR (lots 1,2,3)
       value of debtor's interest $177,550.00; secured claim $211,952.00

(2)    Rental Home at 112 Prairie View Dr.–NLR
       value of debtor's interest $51,000.00; secured claim $20,000.00

(3)    Rental Home at 10 Goodwin Cir.–NLR
       value of debtor's interest $0.00; secured claim $30,000.00

(4)    Rental Home at 2500 E. 2nd St.–NLR
       value of debtor's interest $20,000.00; secured claim $25,000.00

On Schedule I, the debtor stated, as she had in her first case, that her employer was Quality Auto Sales.  This time, however, the debtor listed her occupation as "used car sales" rather than "manager."  She listed $2000.00 in monthly "gross wages, salary and

---

[11]    According to the debtor's SOFA, Everhome Mortgage had foreclosed on 6 Cedar Creek Court with the year prior to the filing of the debtor's second case.

8

commission" but listed no income "from rental property and from operating a business, profession, or farm" as she had in her 2014 case. As before, she disclosed no income derived from being a real estate agent. Like her 2014 SOFA, the debtor's July 31, 2015 SOFA instructed that

> Questions 1-18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19-25. **If the answer to an applicable question is "None," mark the box labeled "None."**

Question 1 of the SOFA asked the debtor to

> State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities, either as an employee or independent trade or business, from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year.

In response to Question 1, the debtor stated:

> $12,000.00    Income 2015 to date
> $24,000.00    Income 2014
> $24,000.00    Income 2013

Question 2 of the SOFA required the debtor to

> State the amount of income received by the debtor other than from employment, trade profession, or operation of the debtor's business during the **two years** immediately preceding the commencement of this case.

Although she had disclosed rental income in her prior case, in response to Question 2 in her second case, the debtor answered "None."

Consistent with her answer to the same question in her first case, the debtor marked the box labeled "None" in response to SOFA Question 10, which required the debtor to

> List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case.

9

In step with the answers that the debtor gave in her first case, the debtor marked the boxes labeled "None" in response to Questions 14 and 18 which respectively required the debtor to "List all property owned by another person that the debtor holds or controls[]" and to

> list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full or part-time within **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case.

Although the debtor's answers to SOFA Questions 10, 14, and 18 were consistent with the answers she gave in her first case, her responses to other questions differed. For instance:

•       In response to Question 2, the debtor deleted any reference to rental income;

•       In response to Question 4, the debtor disclosed the pending state court lawsuit with Arvest;

•       In response to Question 5, the debtor disclosed that Everhome Mortgage had foreclosed on her property at 6 Cedar Creek Court.

On February 4, 2016, the debtor attended her chapter 13 § 341(a) meeting of creditors. Matthew Black, appearing for the chapter 13 trustee, swore the debtor in prior to questioning her at the meeting. In response to his questions, the debtor stated under oath that she was familiar with her petition and schedules, that the information provided was true and correct to the best of her knowledge, and that she knew of no errors or omissions that needed to be brought to his attention. Trial Tr. vol II, 32-33.

On August 19, 2015, Arvest filed a *Motion to Dismiss With Prejudice, or in the Alternative, Motion for Relief From the Automatic Stay and Motion to Abandon*. In its motion, Arvest alleged that the debtor had filed inaccurate and misleading schedules in which the debtor omitted and undervalued assets and claimed ownership of property

10

owned by Dokes Auto and JNYLECO to stall Arvest's foreclosure in state court. Neither the debtor nor Martindale appeared at the hearing scheduled for October 29, 2015. On December 2, 2015, the Court entered an order granting Arvest's alternative prayer for relief from the automatic stay, finding that "the Debtor is the owner of a business named Dokes Quality Auto Sales, Inc. Debtor is also the owner of a business named JNYLECO, Inc. which does business as JNYLECO Properties. (Pl. Ex. 2.) The Court also found that "the Dokes Auto Collateral is owned by the entity Dokes Quality Auto Sales, Inc. and the JNYLECO Collateral are [sic] owned by JNYLECO, Inc. As such the Collateral are not property of the bankruptcy estate, and are not subject to the automatic stay." (Pl. Ex. 2.)

## V.   Conversion of second case to chapter 7

On December 30, 2015, Arvest filed a *Motion to Convert Case to a Case Under Chapter 7, or in the Alternative, To Dismiss Case With Bar to Future Discharge* [motion to convert]. In its motion to convert, Arvest again alleged that the debtor had improperly claimed ownership of collateral that was actually owned by Dokes Auto and JNYLECO in an attempt to delay Arvest's foreclosure on the properties. Arvest also alleged that the debtor had failed to disclose her 2014 transfers of the 145th Street and Dineen properties to Talesha, as well as her ownership of Dokes Auto and JNYLECO, in addition to omitting several other assets from her schedules and statements–including two bank accounts, a liquor license, and an interest in a home located at 1217 Curtis Sykes Drive that she had inherited from her parents.[12] The Court scheduled a hearing on the motion to convert for February 9, 2016. On February 8, 2016, Martindale filed a document entitled *Amendment to Petition* that had been reviewed and approved by the debtor and was signed electronically by both Martindale and the debtor. (Pl. Ex. 8.) In the amendment, the debtor disclosed the following information:[13]

---

[12]   1217 Curtis Sykes Drive is also known as 1217 East 15th Street.

[13]   Although the debtor included in this amendment a handful of assets that she had already disclosed in her initial schedules and SOFA, the Court reproduced here only

| SCHEDULE A: SECURED PROPERTY | VALUE | SECURED CLAIM |
|---|---|---|
| 1.  Dokes Quality Auto Sales owns property at 2500 E. Broadway, NLR, AR. Jocelyn Dokes is the sole owner of Dokes Quality Auto Sales | 177,550 | 211,952 |
| 2.  112 Prairie View Street, NLR, AR is owed [sic] By JYNELCO, Inc. Jocelyn K. Dokes is the sole owner of JYNELCO, Inc. | 51,000 | 20,000 |
| 3.  10 Goodwin Circle, NLR, AR is owned By JYNELCO, Inc. Jocelyn K. Dokes is the sole owner of JYNELCO, Inc. | 45,000 | 30,000 |
| 4.  704 West 18th Street is owned By JYNELCO, Inc. Jocelyn K. Dokes is the sole owner of JYNELCO, Inc. | 3000 | None |
| 6.  1217 East 15th Street, NLR Debtor's interest in this property is as a Child to deceased parents.  The value of her interest in this property is not known at this time.[14] | | |

| SCHEDULE B: PERSONAL PROPERTY | VALUE |
|---|---|
| 2.  Quality Auto Sales, Inc. Bank Account at Regions | 4000.00 |
| Bank of America Checking Account | 200.00 |
| AR Federal Credit Union Checking Account Closed Within past Year | .00 |
| 8.  38 Pistol | 100.00 |

---

the information that the debtor amended or disclosed for the first time on February 8, 2016.

[14]   As discussed previously in section IV., the debtor's original Schedule A in this case reflected negative equity of $38,402.00 on four properties that she had shown in her 2014 case as having equity of $250,847.98.  In this amendment, the debtor disclosed that Dokes Auto owned 2500 East Broadway and JNYLECO owned 112 Prairie View and 10 Goodwin Circle.  She also altered the property values and secured debt amounts on all four properties in this amendment, this time to show slight equity of $6598.00.  She also disclosed for the first time a third property owned by JNYLECO at 704 West 18th Street with equity of $3000.00, as well as her ownership of some portion of a sixth property at 1217 East 15th Street (also referenced as 1217 Curtis Sykes Drive) with no encumbrances and an unknown value.

13.  Sole owner of Dokes Quality Sales [sic] (Estimated Value)          220,000.
Including property at 2500 E. Broadway, NLR

13.  Sole owner of JYNELCO, Inc.  (Estimated Value)
Including property at
112 Prairie View Street,
10 Goodwin Circle, NLR, AR, and
704 West 18th Street                                                            110,000

13.  Owner Red Barn, Inc.                                                       00.

23.  Liquor License at 1300 [sic] 145th Street                         1000.

**SCHEDULE I:  INCOME**

In addition to the income from Quality Auto Sales of $2000.00 per month;
Debtor has real estate earnings from Cochran & Davis Real Estate of approximately
$1,000.00 per month.

**COMPENSATION OF ATTORNEY FOR DEBTOR**

For legal services, Everett O. Martindale has agreed to accept:          3500.00

Amount I have received                                                           800.00

The filing fee has been paid.

**OTHER:**

All other Exhibits, Schedules, Summaries, Declarations, Statements, Disclosures and
Certifications remain the same if not specifically amended herein.

(Pl. Ex. 8.)  At the February 9, 2016 hearing on the motion to convert,[15] the debtor

testified that she "skimmed through" the questions that were asked on her petition and

schedules.  Mot. to Convert Hr'g Tr. 55-56, Feb. 9, 2016.[16]  She also testified that she

looked at what was "put on paper."  Mot. to Convert Hr'g Tr. 56.  She said she personally

reviewed her initial petition and schedules with her attorney before signing them.  Mot. to

Convert Hr'g Tr. 55.  The debtor testified that she signed the petition and schedules

before they were filed and that she was aware of the information that she provided to the

Court.  Mot. to Convert Hr'g Tr. 55.  She likewise testified that she reviewed her petition

---

[15]  Judge Richard D. Taylor presided at the hearing on February 9, 2016.

[16]  The transcript of the hearing on the motion to convert was introduced at trial as
Plaintiff's Exhibit 24.

13

and schedules in her first bankruptcy case prior to signing them and that she "paid attention to the documents." Mot. to Convert Hr'g Tr. 57, 59. The debtor also expressed an understanding that she was required, in both cases, to provide a list of everything that she owned or had an interest in. Mot. to Convert Hr'g Tr. 59. She testified that she reviewed the SOFA in her current case prior to its filing and acknowledged that she did not disclose any of the companies for which she was an owner, officer, director, or member within the six years prior to filing. Mot. to Convert Hr'g Tr. 63, 66. At the hearing, Arvest's counsel questioned the debtor about her 2014 transfers to Talesha:

> Q.    Well, I'm looking two days–at this document prepared two days prior to your [first] bankruptcy filing. And you'll agree that you deeded this property from your individual name to your daughter, Talesha, correct?
> A.    Yes.

Mot. to Convert Hr'g Tr. 73-74.

> Q.    Let me ask the question again, Ms. Dokes. Do you understand that this quit claim deed was prepared and signed–
> A.    Yes.
> Q.    –within two years prior to this current bankruptcy filing?
> A.    Yes.

Mot. to Convert Hr'g Tr. 71-72. Despite acknowledging that she transferred the 145th Street property to Talesha and transferred the Dineen property to Talesha on behalf of Red Barn within two years of filing her second case, the debtor admitted that she did not disclose the transfers, testifying unequivocally on the issue at the hearing on the motion to convert:

> Q.    So you did not list any transfers of real estate within two years prior to this bankruptcy filing, correct?
> A.    No, I didn't. No.

Mot. to Convert Hr'g Tr. 67-68. The debtor also testified that she drafted a second set of deeds on April 14, 2014, that were recorded on June 3, 2014, that purported to transfer the same properties–the four acres and event center located at 145th Street and the adjacent six acres located on Dineen Drive–to DM of NLR, LLC [DM of NLR]. The debtor acknowledged that none of four deeds transferring property to Talesha or DM of NLR bore tax stamps indicating that the property had been transferred for value. She

14

also admitted that the *Real Property Transfer Tax Affidavit of Compliance Form* that she completed for the transfer of the Dineen property to DM of NLR stated that the "full consideration for the transaction" was $1.00.  The debtor maintained at the hearing that she had no interest in DM of NLR; rather, the LLC was owned by her nephew, Darren McFadden, and Talesha.  She claimed that she did not know the nature of DM of NLR's business.  She knew, however, that the property that she and Red Barn had ostensibly transferred to DM of NLR was being used as an event center–and had been for the past two years–and testified that someone wanting to schedule an event at the event center could call her and she would "put them in touch where they needed to be."  Mot. to Convert Hr'g Tr. 85.  She also confirmed that the event center serves alcohol using the liquor license held in the debtor's name.  Mot. to Convert Hr'g Tr. 85.  The debtor acknowledged that although the Arkansas Secretary of State's records reflect that Talesha Dokes is the registered agent for DM of NLR, Talesha's address is on record with the Secretary of State as 1217 Curtis Sykes in North Little Rock–the debtor's residence and mailing address at the time of the hearing–rather than Talesha's address in Michigan, where she resides.  Mot. to Convert Hr'g Tr. 78-79.

At the conclusion of the hearing on the motion to convert, the Court ruled that conversion of the debtor's case to a case under chapter 7 was warranted.  In its ruling, the Court found that the debtor had made material non-disclosures in both her first and second cases, that in both cases the debtor had failed to disclose relevant business ownerships, interests, and relationships, and that the debtor had made questionable pre-petition transfers of property.  In relation to the debtor's pre-petition transfers, the Court stated for the record that

> the debtor's testimony is not credible in this regard, not knowing who the ownership was, what the entities were, it's clear, and I'll discuss it in a few minutes, that there's some business being conducted on two adjoining tracts, and I'm confident the debtor is fully aware of those businesses, who owns what, who does what, and who is responsible for what, and why things got transferred.  She prepared the deeds and she has a background in real estate and I'm comfortable she knows more than she testified to today.  I'm equally confident that a Trustee may need to investigate not only those transactions, but the debtor's ownership of

15

the house in which she resides.

Mot. to Convert Hr'g Tr. 121.

> Additionally, with respect to her prior bankruptcy, it was filed, as I stated, in April, specifically, April 16, 2014.  And I'm immediately concerned and bothered by the cavalier manner in which the schedules were put together.  No listing of gifts in the Statement of Financial Affairs.  No listing of various transfers within two years prior to filing the bankruptcy.  And that's especially egregious in that case because the transfers happened not two years before bankruptcy or within that window, but just a couple of days before bankruptcy.  That's not inadvertent.  That's not a mistake. That's not "I forgot."  That's "I transferred because I'm filing bankruptcy."  I presume that–and I think I can reasonably presume that all those schedules didn't get prepared the next day, that they were probably already in process, and–and how this debtor could even suggest or fathom that she transferred property that was in her name–and again, she's a Realtor, she's done this a lot, knows how property is transferred–and then forget to put it on her schedules. And that bled over into the next bankruptcy.  But her testimony simply is not credible in that regard.

Mot. to Convert Hr'g Tr. 121-122.  Based upon these and other findings, the Court entered an order converting the debtor's second chapter 13 case to a case under chapter 7 on February 10, 2016.  M. Randy Rice was appointed chapter 7 trustee [the trustee] of the debtor's case. On May 4, 2016, the trustee filed a *Motion to Compel Debtor to Attend Meeting of Creditors*, alleging that the debtor had failed to appear for two scheduled § 341(a) meeting of creditors and seeking an order compelling her to attend the next scheduled meeting.  On May 10, 2016, the Court granted the trustee's motion to compel.  When the debtor finally attended her chapter 7 § 341(a) meeting on June 14, 2016, she refused to answer questions upon Martindale's advice, citing potential criminal issues.  Trial Tr. vol II, 146, Jan. 20, 2017.[17]

---

[17]  On June 23, 2016, the trustee filed a separate adversary proceeding against the debtor, Talesha, and DM of NLR seeking to avoid the debtor's and Red Barn's transfers of the 145th Street and Dineen properties to Talesha and DM of NLR.  All three defendants filed motions to dismiss the trustee's adversary proceeding.  On September 9, 2016, the Court denied the defendants' motions to dismiss.  On September 10, 2016, Preston "Tony" Woods executed a 10-day Notice of Intent to File Lien, asserting that the debtor and Talesha owe him $242,734.00 for material, labor, and services performed on the 145th Street property in 2010.  On October 17, 2016, Woods recorded a

## VI.    Arvest's adversary proceeding

On May 23, 2016, Arvest filed this adversary proceeding, seeking a denial of the debtor's discharge under § 727(a)(2) and (a)(4)(A).  In its complaint, Arvest further developed the allegations upon which it had based its motion to convert; namely, that the debtor failed to disclose numerous assets, sources of income, and transfers of property when she filed her current bankruptcy case.  Specifically, Arvest alleged in its adversary proceeding that the debtor falsely claimed to own collateral that she knew was owned by non-debtor entities JNYLECO and Dokes Auto; failed to disclose rental income; failed to list her interests in JNYLECO and Dokes Auto; failed to disclose her transfers of the 145th Street property to Talesha and DM of NLR, LLC; failed to disclose her interest in her deceased parents' home at 1217 Curtis Sykes Drive, failed to disclose her real estate license and the income received from selling real estate; failed to account for two bank accounts that were closed within one year of filing this case; failed to list any debts owed to taxing authorities; and failed to disclose that she drives a vehicle owned by Dokes Auto.  On June 14, 2016, the debtor, still represented by Martindale at the time, filed a one-page answer that generally denied Arvest's allegations and reserved the right to "file a more complete response" to the complaint because the debtor was in the process of retaining new counsel.  The Court originally scheduled the trial for October 4, 2016, but because Lyndsey Dilks did not enter an appearance as the debtor's counsel in this adversary proceeding until September 30, 2016, the Court granted the debtor's motion to continue and the trial was rescheduled for January 19, 2017.

On January 18, 2017–one day before trial–the debtor amended her schedules and SOFA. (Def. Ex. I.)  In this amendment, the debtor made the following changes and new

---

materialman's lien on behalf of his company, H & W Construction, Inc., against the 145th Street property.  Woods's affidavit (filed as part of his lien) states that "the final furnishing of said labor and supplies occurred within the past ninety days."

The debtor testified that Woods–whom she characterized as a close friend that she has known for years–completed  work on the 145th Street property in 2013.  Woods was not called as a witness at trial.

disclosures:

•   clarified that her inherited interest in 1217 East 15th Street also known as 1217
    Curtis Sykes Drive is a 1/8 interest with a value of $9264.00;

•   disclosed an additional $700.00 in personal clothing;

•   changed value of liquor license from $1000.00 to $10,000.00;

•   reduced her ownership interest in Dokes Auto from 100% to 50%;

•   disclosed her 100% ownership of Lending Hand Foundation;

•   disclosed existence of $1300.00 lien filed by IRS;[18]

•   disclosed debt to IRS of $14,113.54;

•   disclosed debt to Arkansas Federal Credit Union;

•   disclosed debt to Miranda Keener;

•   disclosed small claims lawsuit filed by Miranda Keener within one year prior to
    debtor filing bankruptcy;

•   disclosed debt to Sprint Nextel Distributions

•   disclosed two credit card debts owed to Wells Fargo (although Wells Fargo had
    been listed on the debtor's initial Schedule F filed in this case on July 31, 2015,
    the debtor had previously provided no address for this creditor and only one
    account number)

•   disclosed that Dokes Auto and JNYLECO were codebtors on the two Arvest
    debts

•   on Schedule I, changed her employer from Quality Auto Sales to Dokes Quality
    Auto Sales

•   on Schedule I, deleted the previously scheduled $2000.00 in "monthly gross
    wages, salary, and commissions" and added $2300.00 in "net income from rental
    property and from operating a business, profession, or farm."

•   on Schedule I, disclosed "occasional income from Rental Income, currently

_____

   [18]  According to the IRS's proof of claim filed on July 21, 2016, the lien attached
to the debtor's property on August 5, 2008.

18

$300/month" and changed income from real estate commissions from $1000.00 on Amendment to Petition to $155.00 per month

• on Schedule J, added monthly expenses of $125.00 for personal property taxes, $25.00 for life insurance, $100.00 for real estate taxes, and $100.00 for "property, homeowner's, or renter's insurance";

• deleted her previously scheduled monthly expense of $500.00 for transportation expenses;

• disclosed on Schedule J a monthly payment $394.00 to Bank of America for the "2nd Street Property";

• in her SOFA, disclosed rental income of $1800.00 and real estate commission of $1500.00 for the period of January 1, 2015 to July 31, 2015;

• in her SOFA, disclosed "cash contributed on a monthly basis in an aggregate total of $1,200.00" to Samaritan Hills Baptist Church for "Jan-Dec";

• in her SOFA, disclosed transfer of 145th Street property and "adjacent lot" to Talesha on April 14, 2014, in exchange for "Real property taxes paid and $100,000 floor plan obtained";

• in her SOFA, disclosed that she had closed a checking account at Arkansas Federal Credit Union with balance of $250.00 within one year of filing bankruptcy (*Amendment to Petition* stated balance was .00);

• in her SOFA, disclosed the dates she obtained her corporate interests:
  Jocelyn's Grille, Inc.          (2005 to current)
  Dokes Quality Auto Sales, Inc.  (1997 to current)
  JNYLECO, Inc.                   (2001 to current)
  Lending Hand Foundation         (October 2010 to current)

In the light of the number of changes and first-time disclosures that the debtor made in her February 8, 2016 *Amendment to Petition* and January 18, 2017 amendment, the debtor–prudently–did not attempt to convince the Court that the schedules filed on July 31, 2015, were accurate. Instead, the debtor acknowledged at trial that her initial schedules and statements were incorrect when she filed them but argued that the omissions and inaccuracies were not intentional and not her fault for a myriad of reasons discussed below.

19

4:16-ap-01049 Doc#: 33 Filed: 05/02/17 Entered: 05/02/17 16:21:38 Page 20 of 47

The debtor listed 1217 East 15th Street as her street address when she filed this case but testified that she was not living there at that time. Rather, the debtor maintained that she was living with a friend and simply used 1217 East 15th Street as her mailing address. At trial, she acknowledged that she has lived at 1217 East 15th Street in the past and recognized that she has testified at a prior hearing in this case that she was, in fact, residing at that address.[19] She stated that she did not disclose the interest in 1217 East 15th Street that she inherited from her parents because she did not realize that she had an interest to disclose. According to the debtor, her mother had made it clear to whom the property should go and the debtor did not believe that she was supposed to inherit a share of the property along with her siblings.[20] Trial Tr. vol II, 161. At trial, the debtor testified that "I've learned that I need to claim an interest or else I'll be saying I'm a fraud if I don't." Trial Tr. vol II, 161.

Although the debtor reluctantly accepted responsibility for failing to disclose her interest in 1217 East 15th Street, she was unwilling to shoulder even partial blame for much else, contending that most of the problems in this case are due to the errors of her attorneys. Specifically, the debtor argued that most of the errors in this case could be traced to Phillips, the attorney that filed her prior case in 2014. The debtor maintained that she disclosed to Phillips the information that was necessary to file accurate schedules in her first case but, for reasons unknown to the debtor, Phillips did not put the information on her schedules. According to the debtor, Phillips's mistakes in the first case carried over into her second case because Martindale "went online and pulled the documents from the

---

[19] 1217 East 15th Street is the same property as 1217 Curtis Sykes Drive. The debtor testified on February 9, 2016, at the hearing on the motion to convert that she lived at 1217 Curtis Sykes Drive. At that time, the debtor testified that she lived there alone but then added that her son was also living there "for a short time." Mot. to Convert Hr'g Tr. 79.

[20] The Court has no evidence establishing the date that the debtor inherited her interest in 1217 Curtis Sykes Drive from her parents, who died intestate, but infers from the totality of the debtor's testimony on the subject that it was prior to the filing of her first case.

first case and that's what was put on the second case." Trial Tr. vol II, 155. Because the debtor largely attributed the errors and omissions in this case to mistakes made by Phillips in her first case, the parties spent a significant amount of time at trial attempting to ascertain what information the debtor did, in fact, disclose to Phillips. When the debtor was questioned by her attorney regarding her disclosures to and alleged reliance upon Phillips, she testified:

> Q.   And we talked – in talking about Talesha, we talked about her with regard to transfers of property?
> A.   Yes.
> Q.   And you saw Mr. Phillips was here earlier. Did he represent you in a 2014 bankruptcy case?
> A.   Yes.
> Q.   And did you talk to Mr. Phillips and tell him about the transfers of property?
> A.   Yes.
> Q.   Was it your understanding that the information you gave him was to be accurately reflected in your bankruptcy statement?
> A.   Yes.
> ---
> Q.   –in reviewing that 2014 bankruptcy documents, are you now aware that there are inaccuracies?
> A.   Yes.
> Q.   Did you intend to be inaccurate?
> A.   No, I didn't, because we told Mr. Phillips about the transfer. I think it was before the transfer even happened. And I felt like if I had given him that information, then it would have been up to him to, you know, do it accurately. I didn't know –I didn't know anything about the bankruptcy laws, or it's got to be six years here, one year there, three years there, so I wasn't aware of all that.

Trial Tr. vol II, 152-54. The debtor maintained that she told Phillips about the transfer of the 145th Street property to Talesha, disagreeing with Arvest's contention that she failed to disclose the transfer even though it did not appear on her 2014 SOFA. Specifically, the debtor testified:

> Q.   Thank you. Now turn over to page 10 of 15, item number 10, that asks you to list your – all transfers within two years prior to your bankruptcy filing. You – would you agree that you failed to list the transfer of the 145th Street property to Talesha?
> A.   No, I don't agree that I failed to list it, because it was told to the attorney

21

> and how they did it was how they did it.  So, no, I don't agree that I failed
> to list it.  I did list it.  They were told about the property.

Q.   Did you– did you list the transfer of the property in item 10 of your
     Statement of Financial Affairs that was filed with the Bankruptcy Court?

A.   No, it's not listed on there.

Q.   And then, as you've testified to before, you – you paid attention to the
     documents?

A.   Yes, I did testify to that.

Trial Tr. vol II, 129.  In response to Arvest's counsel's inquiries regarding the debtor's

failure to list any of her corporate ownership interests, the debtor testified that "It's not

listed on here, but it was known about JNYLECO, Dokes Quality Auto Sales.  The Red

Barn had been transferred, so I didn't assume I had an interest in Red Barn."  Trial Tr.

vol II, 126.  When Arvest's counsel asked the debtor to confirm that she did not see a

need to disclose her interest in Red Barn to her attorney, the debtor testified that she

believed that she had transferred Red Barn, Inc. to Talesha, and therefore did not have an

interest in Red Barn, Inc. or Jocelyn's Grille to disclose to Phillips:

Q.   You didn't see any need to disclose that to your attorney?

A.   They knew about Red – they knew about Dokes Quality Auto Sales.  It
     wasn't the Red Barn because Red Barn – okay.  They knew about the
     Dokes Quality Auto Sales, the Jnyleco, and all of that –

Q.   But they didn't know–

A.   –I had an interest in those.

Q.   But they didn't know about Red Barn, Inc. or Jocelyn's Grille?

A.   Red Barn had been transferred, I didn't assume I had any interest in Red
     Barn.

Q.   Did you have an interest in Jocelyn's Grille?

A.   Yes, I would have had an interest in Jocelyn's Grille – well, Red Barn and
     Jocelyn's Grille is the same, so if I didn't have –if I didn't think I had an
     interest in Red Barn, I wouldn't have had an interest in Jocelyn's Grille.

Q.   Who did you transfer those to?

A.   That's what was transferred to Talesha.

---

Q.   And when did you transfer Red Barn to Talesha?

A.   In '14.

---

Q.   At the same time that you transferred the properties to her?

A.   Yes.  That is what I was under the assumption of.

Trial Tr. vol II, 126-28.  When Arvest's counsel questioned the debtor about her alleged belief that she had transferred the corporation of Red Barn, Inc. to Talesha when she transferred the Dineen property (owned by Red Barn, Inc.) to her, the debtor maintained that she had told Phillips about the transfer.  Yet, she also testified that Red Barn's property was "with the land commission" when she consulted Phillips:

> Q.   Would you agree you failed to list the transfer of Red Barn, Inc. to Talesha?
>
> A.   No, I don't agree.  I told the attorney.  They didn't list it here.  I told the attorney about the transfer of Red Barn, Inc.
>
> Q.   Would you agree –
>
> A.   And actually, it would have been with the land commission, so.
>
> ---
>
> Q.   At the time you filed bankruptcy?
>
> A.   Yes.
>
> Q.   And so, Red Barn, Inc., the company, does not appear – would you agree with me that Red Barn, Inc. –your transfer of Red Barn, Inc. to Talesha does not appear under item 10 on your Statement of Financial Affairs?
>
> A.   It's not on here, but it was disclosed.
>
> ---
>
> Q.   Do you agree that you failed to identify yourself as an officer of Red Barn, Inc.?
>
> A.   If the company was transferred, I did not assume I was an officer of Red Barn, Inc.
>
> Q.   Now, Ms. Dokes, if you were paying attention to the documents, you would notice that question 18 requires you to list all businesses in which you were an officer, director, partner, or managing executive of within six years prior to your bankruptcy filing.
>
> A.   Okay.
>
> Q.   Correct?
>
> A.   Yes.  Six years.
>
> Q.   And within six years prior to this bankruptcy filing, were you an officer of Red Barn, Inc.?
>
> A.   Yes, I was.
>
> Q.   Were you an officer of Jocelyn's Grille, Inc. within six years prior to the bankruptcy filing?
>
> A.   They are one in the same.  Red Barn, Inc. is Jocelyn's Grille.  The attorney transferred it from Red Barn into Jocleyn's Grille.  So they are one in the same.  They are the same company.
>
> Q.   John Phillips transferred it?
>
> A.   No, John Phillips didn't transfer it.
>
> Q.   But no– you failed to list any company in which you were an officer or director of within six years prior to your bankruptcy filing in 2014,

23

correct?
A.    Yes.
Q.    You also failed to list Dokes Quality Auto Sales, Inc., correct?
A.    Yes.
Q.    And you failed to list Jnyleco, Inc., correct?
A.    Yes.
Q.    And did you own five percent or more of the stock in each of those companies?
A.    Yes.

Trial Tr. vol II, 129-31.  The debtor admitted that she did not disclose her ownership of a liquor license in the course of her 2014 case.  Trial Tr. vol II, 126.  She did not attempt to justify her failure to disclose the license.  Phillips testified that he first met with the debtor on April 14, 2014.  To the extent that he could recall, Phillips testified about his interactions with the debtor in 2014, and, more generally, about his office protocols for handling a bankruptcy case:

Q.    Tell me about what happens during a consult with a client.
A.    You know, typically, they're going to come in and they're going to fill out the client information sheet and we're going to review that.  In my office, basically the way we handle it, is that, you know the attorney gets the information first, looks it all over, makes a determination, speaks with the client, trying to figure out what kind of case needs to be filed, if any case needs to be filed.  And then when a determination is made that they're going forward, they'll sit down with a paralegal who will go through budget, personal property, things like that.
Q.    When you meet with a client, do you find out additional information beyond what is contained on the client personal information sheet?
A.    Well, yes.  I mean, obviously, the client information sheet is a starting point.  And then, what they tell us while we're going through it.  Sometimes we'll make notes on the client information sheet.  Sometimes we'll type it straight into the computer.
---
Q.    Did you ask Ms. Dokes about what business entities she owned?
A.    You know, I can't specifically recall the details of the conversation that day.  I do recall that she had a business and – well, I do recall that there was a business and it was discussed, I believe a car lot, and that there were some other business entities that would belong to her children.  But that's about the extent of my actual recollection of it.

24

Trial Tr. vol II, 95-96.  Both the debtor's counsel and Arvest's counsel questioned Phillips about the information that the debtor had disclosed to him regarding property transfers–focusing their inquiries on the "property transfer" section of the intake form that asked whether the debtor had sold or transferred any real property in the last three years.  In response, the box next to "yes" was checked.  Under the next question on the form stating "If yes, when and to whom did you transfer it:" there is a notation stating only "Commissioner Land Sale."  The location of the property is disclosed as "1400 145 St. Wrightsville 72206."  When the debtor's counsel asked Phillips about the property transfer section of the form, he testified:

> Q.     And I think I had asked to turn the page –I think it's the fourth page that deals with property transfers.
> A.     Yes.
> Q.     And so, it indicates on there, on the intake sheet, that Ms. Dokes did disclose the transfer of property at 1400 145th Street?
> A.     That's correct, it is on there.

Trial Tr. vol II, 89.  However, when Arvest's counsel cross-examined Phillips, he clarified that the information about the land commissioner sale of the 145th Street property was added to the intake form by his assistant rather than the debtor and he did not know if the information was added to the form on April 14, 2014, or in the days after that date.  Trial Tr. vol II, 97.  When Phillips was asked if he recalled discussing the land commissioner sale with the debtor, he testified:

> A.     I recall that it came up during the consultation in general.  I don't specifically recall speaking to her about it.  I mean, I–I know that we did. I don't recall the conversation, let me put it that way.  And there were some questions that this note, "Commissioner Land Sale," would basically be for us to try to figure out what it was and whether it was actually something that she owned or when it was taken.  I mean, there's nothing specifically there, but it – it would have been discussed.  I can't tell you the exact details of the discussion.
> Q.     And so, you don't recall – do you recall whether Ms. Dokes informed you that this property was sold –
> A.     Yes, I –
> Q.     – as part of a Commissioner of Land sale?
> A.     I know that she did tell us that the property had been sold at a land sale. And I'm believing that what I was told at that time is that her daughter had bought it back – redeemed it by paying the taxes.

> Q.   So – so the daughter had purchased the property from the Commissioner?
>
> A.   That's my recollection.  Now, I – you know, some of that is – could be information that I obtained through the course of the case, but my recollection is that that's what happened.

Trial Tr. vol II, 97-98.  The redemption deed for the 145th Street property substantiated Phillips's recollection that the 145th Street property had already been redeemed from the land commissioner when the debtor consulted him on April 14, 2014.  (Def. Ex. F.)  The redemption deed recited that the 145th Street property had been certified to the Commissioner of State Lands for the non-payment of taxes and that Jocelyn Dokes, claiming to the be the owner of the property, had filed a petition to redeem the property. For "consideration of $13,105.59 so paid," the Commissioner of State Lands transferred the property to Jocelyn Dokes on April 10, 2014.  Phillips testified that the debtor did not provide him with any copies of deeds showing transfers of property to or from the debtor or her companies.  Trial Tr. vol II, 106.

Phillips filed the debtor's first chapter 13 petition and most of her schedules on April 16, 2014.  He filed the debtor's SOFA and Schedules I and J on April 23, 2014.  He testified that he requires, in all instances, for his clients to sign the exact copy of the schedules and statements that he files with the Court.  He counsels his clients regarding the potential penalties that could arise if they file incorrect information with the Court.  He stated that his clients "have to give us the information and verify it and sign those documents." Trial Tr. vol II, 104-05.  Phillips testified that if the debtor had spoken up and said that something was not correct in the documents that he asked her to sign, he would have made the necessary corrections.  Trial Tr. vol II, 105-6.  Phillips confirmed that he filed no amended schedules or statements on behalf of the debtor prior to her case being dismissed approximately five months after it was filed.  Trial Tr. vol II, 93.

After the debtor's first case was dismissed on January 9, 2015, Arvest sued the debtor, Dokes Auto, and JNYLECO in state court.  The debtor retained Martindale to defend her and her two entities in the Arvest litigation and later agreed with Martindale's suggestion

that she should file a second chapter 13 case.  The debtor testified that Martindale did not provide an intake form similar to Phillips's but instead prepared her second case by using the same information that Phillips had filed in her 2014 case:

> Q.     Now, when you say you signed bankruptcy petition and schedules, what did you actually sign?
> A.     The form that she [Martindale's assistant] gave me.  I told you they printed off the same thing from the previous bankruptcy and she filled that in, and she took the same information and filled it in.
> Q.     So you're saying that this document here contains the exact same information as your prior bankruptcy case?
> A.     Yes, it does.
> Q.     And you didn't provide any different information?
> A.     No, they took the same information.  She printed it off from the previous bankruptcy. [21]

Trial Tr. vol II, 16.   In response to Arvest's counsel's questions, the debtor testified:

> Q.     And had you reviewed your bankruptcy petition and schedules before you signed them?
> A.     Yes, I had.
> Q.     And were those bankruptcy petition and schedules true and correct to the best of your knowledge?
> A.     To the best of my knowledge.
> Q.     And you personally went through them with your attorney, Everett Martindale, correct?
> A.     No, I didn't go through them with Everett Martindale.  His assistant, Delores.
> ---
> Q.     And you reviewed each page and the documents that were in front of you?
> A.     Yes.  And actually what they did, was pull the first bankruptcy and use the same pages.
> Q.     Did you actually sign the petition and schedules before they were filed with the Court?
> A.     Yes.
> ---

---

[21]  Contradictorily, the debtor also testified that Martindale's assistant had asked the debtor additional questions related to her schedules, reviewed the debtor's answers with her, and made changes to the schedules prior to Martindale filing the debtor's second case.  Trial Tr. vol II, 156,174-76.  The Court notes that much of the debtor's testimony at trial was confusing, vague, and inconsistent.

Q.      So the info–the information in these bankruptcy petition and schedules is
        exactly the same as the information that you reviewed?

A.      Yes.

Trial Tr. vol II, 10-11,16.  Despite the debtor's testimony that she reviewed each page of
her petition and schedules prior to filing her second case, the debtor admitted, as noted
previously, that she did not list an interest in 1217 Curtis Sykes Drive.  Trial Tr. vol II,
132.  The debtor also admitted that she did not disclose that she regularly drives vehicles
owned by Dokes Auto.  Trial Tr. vol II, 138-39.  She also acknowledged that she failed to
list any licenses, including the liquor license held in her name, and offered no
justification for this particular omission.  Trial Tr. vol II, 135.  Additionally, although the
debtor was the president of Dokes Auto, Jocelyn's Grille, Red Barn, and JNYLECO
within the past six years, she admitted that she did not disclose that she was an officer of
any company within that time frame.  Trial Tr. vol II, 140.  She also admitted that she did
not list an interest in Jocelyn's Grille (formerly Red Barn) or in any other business.  Trial
Tr. vol II, 134-35.

However, the debtor absolved herself of responsibility for failing disclose her business
interests by insisting that she had told Phillips and Martindale that she had transferred
Red Barn, Inc. to Talesha[22] and faulting Martindale, in particular, for failing to disclose
her interests in Dokes Auto and JNYLECO because he had represented the debtor and
those entities in the state court litigation with Arvest and ostensibly knew of her
ownership interests.  Trial Tr. vol II, 167-68.  The debtor conceded that she did not list
any transfers of property that occurred within the two years before her second filing.
Trial Tr. vol II, 135-36.  She also specifically admitted that she did not disclose on her
SOFA the transfers that she made to Talesha of the 145th Street  property or the Red
Barn [Dineen] property on April 14, 2014.  Trial Tr. vol II, 138.  She, again, justified the

---

[22]  The debtor acknowledged at trial that she now realizes that she was incorrect to
believe that transferring Red Barn's Dineen property also transferred ownership of the
corporation Red Barn, Inc.   She does not dispute, however, that she intended to transfer
"everything" to Talesha.  Trial Tr. vol II, 166.

omissions on her schedules by saying that she had told Phillips and Martindale about the transfers.  Trial Tr. vol II, 184.

The debtor maintained that she had told Phillips prior to the filing of her first case that she was planning to transfer the 145th Street property and Dineen property to Talesha in exchange for Talesha paying the delinquent taxes to redeem the two properties from the land commissioner and obtaining a line of credit to operate Dokes Auto.[23]  Trial Tr. vol II, 181.  The debtor testified that her son took cash obtained from Talesha's bank account in Arkansas to the land commissioner and successfully redeemed the 145th Street and Dineen properties.  Trial Tr. vol II, 182.  According to the debtor, the source of the cash used to redeem the properties was Talesha's "finances."  Trial Tr. vol II, 182.  Talesha, a graduate student residing in Michigan in 2014 and currently, testified that she became aware that her mother was having financial problems in 2014.  Trial Tr. vol II, 197.  She confirmed that she helped her mother by applying for floor plan financing on behalf of Dokes Auto and by paying delinquent taxes.  Trial Tr. vol II, 197-98.  Talesha said that she unsuccessfully applied for a loan from Car Bucks in June 2014, but obtained a $50,000 line of credit that was later increased to $100,000 from Next Gear Capital, Inc. [Next Gear] in July 2014.  Trial Tr. vol II, 201-02.  Talesha testified that even though the promissory note with Next Gear appears to bear her signature, she did not actually sign the document but that it "probably would have been my brother or sister, whoever was at the office at the time."  Trial Tr. vol II, 217.  Talesha also testified that she did not sign the power of attorney in favor of Next Gear dated July 22, 2014–despite the fact that the power of attorney purports to bear her signature as notarized by Casondra R. Jones–Talesha's ex-sister-in-law.  Talesha explained:

> A.    Can I say something?  If we're going to go through all of these signatures, these documents, I've already said that, no they're not my signatures.  I've been working with my family since – I didn't get my first job until I was

---

[23]  Although consideration for the debtor's transfers to Talesha was at issue during the February 9, 2016 hearing on the motion to convert, the debtor made no mention of this alleged consideration until the trial of this adversary proceeding.

> doing my master's, so we sign stuff and do this stuff all the time.
> Somebody may not be here or whatever.  So I'm doing school, so I'm not
> in town.  So, yes, the notary is saying that, but I mean, no, it's not my
> signature.  So we don't have to go through every page.

Trial Tr. vol II, 220.  According to Talesha, on April 10, 2014, she redeemed the 145th
Street property by paying delinquent taxes of $13,105.59 and redeemed the Dineen
property by paying delinquent taxes of $3623.89.  Trial Tr. vol II, 198-99.  Additionally,
Talesha said that she paid delinquent taxes of $2681.00 to redeem a third property
located at 2500 East 2nd Street.  Trial Tr. vol II, 198.  Talesha said that she had "money
in a bank account" that her brother withdrew to pay the taxes because she is "always out
of town."  Trial Tr. vol II, 209-11.  Talesha testified that in exchange for her help with
the floor plan financing and delinquent taxes, she received the 145th Street and Dineen
properties, but later decided that she "didn't want it specifically in my personal name."
Trial Tr. vol II, 202-03.  She said that she created DM of NLR to hold title to the
properties.  Trial Tr. vol II, 203.  She acknowledged that the deeds transferring property
to DM of NLR are dated April 14, 2014, but the Articles of Incorporation filed with the
Arkansas Secretary of State indicate that DM of NLR was formed on May 7, 2014.  Trial
Tr. vol II, 213-14; Pl. Ex. 25.[24]  Talesha testified that she did not discuss the creation of
the deeds with the debtor:

> Q.    I'm looking at Arvest Bank's Exhibit 16, which is the deed from Jocelyn
>         Dokes to DM of NLR, LLC.  Do you believe that this deed was created
>         sometime after April 14, 2014?
> A.    I'm not sure when that was–I don't know when that was created.  I mean, I
>         see the dates.  I don't–I didn't discuss this with her.
> Q.    Was it your testimony earlier that you would have–that you would have
>         informed your mother that you wanted the property in the name of DM of
>         NLR, LLC after the original deed –
> A.    It was already in my name –
> Q.    – was signed.
> A.    –so I didn't have to inform her of anything.
> Q.    Then how –
> A.    So, it came from her, to my personal name, initially.  And so, once I had it

---

[24]  Presumably due to the phonetic similarity, "May 7, '14" was incorrectly
transcribed as "8/7/14."

> in my personal name, I didn't necessarily need to ask her or anything like
> that, of what I needed to do with it from then on.

Trial Tr. vol II, 214-15.  Talesha testified that she has received no income from DM of
NLR since it was formed in 2014.  Trial Tr. vol II, 224.  She also said that she had
executed a contract with Tony Woods in 2010 for work that was to be done on the 145th
Street property and that she and the debtor still owe a debt to Woods as a result.  Trial Tr.
vol II, 195-96.  Talesha could not explain, however, why she obligated herself to pay a
debt for hundreds of thousands of dollars to repair the 145th Street property in 2010–four
years before she had any interest in the property.  Trial Tr. vol II, 230.


Although the debtor attributed the vast majority of the inaccuracies in her schedules to
mistakes made by Phillips and Martindale, the debtor also suggested that some of the
errors in her schedules were due to her own lack of familiarity with the terms contained
in the questions. The debtor stated generally that some of the terms confused her
and–more specifically–that she did not know what the word "priority" meant as it related
to tax claims.  Trial Tr. vol II, 157-58.  However, regarding her failure to list a debt to the
IRS in this case, she explained that she did not think that she owed any taxes when her
second case was filed.  Trial Tr. vol II, 174.  In any event, the debtor said that she
answered the questions to the best of her ability but relied on both Phillips and
Martindale "for the answers."  Trial. Tr. vol II, 158.  According to the debtor, if she had a
question, she would ask Phillips or Martindale.  She also testified that once she gave each
attorney the information, she "relied on them to do what was necessary and what was
needed to file the bankruptcy case . . . ."  Trial Tr. vol II, 158.


**Findings of Fact and Conclusions of Law**

Arvest seeks a denial of the debtor's discharge under § 727(a)(2) and (a)(4)(A).
Because the denial of a discharge is a "harsh and drastic penalty," the statute's provisions
are "strictly construed in favor of the debtor."  *Korte v. U.S. Internal Revenue Serv.* (*In re
Korte*), 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001) (internal citations omitted).  Once a
party objecting to a debtor's discharge "establishes a prima facie case, the burden then

shifts to the debtor defendant to offer credible evidence to explain [her] conduct."
*Robbins v. Haynes* (*In re Haynes*), 549 B.R. 677, 685 (Bankr. D.S.C. 2016).  However,
the objecting party bears the ultimate burden of proving by a preponderance of the
evidence that a debtor is not entitled to a discharge.  *In re Korte*, 262 B.R. at 471.  In this
case, Arvest must prove each element of § 727(a)(2) or (a)(4)(A) by a preponderance of
the evidence in order to prevail upon its objection to the debtor's discharge.

### Section 727(a)(2)

Under  § 727(a)(2) the Court shall grant a debtor a discharge, unless--

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of
> the estate charged with custody of the property under this title, has transferred,
> removed, destroyed, mutilated, or concealed, or has permitted to be transferred,
> removed, destroyed, mutilated, or concealed–
>
> > (A) property of the debtor, within one year before the date of the filing of
> > the petition; or
> > (B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2).  Section 727(a)(2) is fundamental to the concept that a debtor's
chapter 7 discharge is granted upon the condition that he has disclosed all of his assets
and made them available for distribution.  *Helena Chem. Co. v. Richmond* (*In re
Richmond*), 429 B.R. 263, 302 (Bankr. E.D. Ark. 2010).  A creditor objecting to a
debtor's discharge under § 727(a)(2) has the burden of proving four elements by a
preponderance of the evidence–

> (1) that the act complained of was done within one year prior to the date the
> petition was filed, or after the date the petition was filed;
>
> (2) that the act was that of the debtor;
>
> (3) that it consisted of a transfer, removal, destruction, or concealment of the
> debtor's property, or, if the act occurred after the date the petition was filed, the
> property of the estate; and
>
> (4) that it was done with an intent to hinder, delay, or defraud either a creditor or
> an officer of the estate.

32

*See* 11 U.S.C. § 727(a)(2); *see also In re Korte*, 262 B.R. at 472.  Proof that a creditor or the estate was harmed as a result of the debtor's act is not required under § 727.  *In re Richmond*, 429 B.R. at 302 (citing *In re Snyder*, 152 F.3d 596, 601 (7th Cir. 1998)) (citation omitted).  Arvest contends that debtor's discharge should be denied under § 727(a)(2) because she concealed property of the estate when she failed to fully disclose her assets and income when she filed her petition and schedules.  For the reasons stated below, the Court finds that Arvest met its burden of proof under § 727(a)(2).

The Court finds that the debtor concealed property after she filed her petition, satisfying the first and third elements of § 727(a)(2).  Failing to list assets on bankruptcy schedules and statements is tantamount to an act of concealment falling within the time frame required by either prong of § 727(a)(2).  *See Fowler v. Weathers* (*In re Weathers*), No. 5:09-ap-7203, 2011 WL 3207950, at *3 (Bankr. W.D. Ark. July 21, 2011) (citing *Cobb v. Hadley* (*In re Hadley*), 70 B.R. 51, 53 (Bankr. D. Kan. 1987)).  It is generally acknowledged that "'concealment is a continuing act and although the act of concealment might have commenced prior to the one year period,' if it continues post-petition, the requirement of § 727(a)(2) is satisfied."  *Id.* (quoting *Peterson v. Hazen* (*In re Hazen*), 37 B.R. 329, 332 (Bankr. M.D. Fla. 1983)).  In this case, the debtor failed to list numerous assets when she filed her initial schedules and statements on July 31, 2015, and made no effort to correct her omissions during the subsequent seven months.  Instead, the debtor filed amendments only when facing an imminent hearing with potentially adverse consequences for the debtor, filing her first amendment on February 8, 2016–the day before the February 9, 2016 hearing on the motion to convert–and her second amendment on January 18, 2017–the day before this trial was scheduled to begin on January 19, 2017.  Under most circumstances, debtors may amend schedules liberally.  *Kaelin v. Bassett* (*In re Kaelin*), 308 F.3d 885, 889 (8th Cir. 2002) (citing *Armstrong v. Harris* (*In re Harris*), 886 F.2d 1011, 1015 (8th Cir. 1989)).  However, amendments filed after a creditor reveals the falsity of the original documents–as Arvest revealed in both its motion to convert and the complaint commencing this adversary proceeding–do not negate the fact that the debtor's original schedules and statements were inaccurate.

33

*Sholdra v. Chilmark Fin. LLP* (*In re Sholdra*), 249 F.3d 380, 382-83 (5th Cir. 2001).

The Court also finds that it was the debtor that concealed assets when she omitted them from her schedules, satisfying the second element of § 727(a)(2).  Despite the debtor's attempt to place the blame on Phillips and Martindale, the debtor had a "duty to make complete and accurate disclosures on [her] petition, schedules and statements."  *Doeling v. Berger* (*In re Berger*), 497 B.R. 47, 66 (Bankr. D.N.D. 2013).  Although Phillips vaguely recalled a discussion with the debtor about a business that he believed was a car dealership and Martindale ostensibly should have known to disclose the debtor's interests in Dokes Auto and JNYLECO because he represented those entities in state court, there is no evidence–other than the debtor's self-serving testimony–that either attorney was apprised of the full extent of the debtor's assets and income.  However, even if the debtor told Martindale, her attorney in this case, about some of the assets that were omitted from her schedules, she could not abdicate her independent duty to ensure that her schedules accurately depicted her assets.  *See In re Killian*, No. 07-3315, 2008 WL 5834017, *7 (Bankr. D. Or. Nov. 17, 2008).  Additionally, although the debtor blamed many of the omissions in her schedules on her alleged reliance on attorney advice, there is nothing in the record to suggest that Phillips, Martindale, or any other attorney advised the debtor to omit assets and obscure information about her income when she filed her schedules and statements.

The Court further finds that the debtor acted with the intent to hinder, delay, or defraud a creditor or an officer of the estate, satisfying the fourth element of § 727(a)(2).  Section 727(a)(2) requires a showing that the debtor acted with the actual intent.  *In re Korte*, 262 B.R. at 472.  Constructive intent will not suffice.  *Jacoway v. Mathis* (*In re Mathis*), 258 B.R. 726, 733 (Bankr. W.D. Ark. 2000).  Debtors rarely admit that they had the requisite intent.  *In re Korte*, 262 B.R. at 472.  Thus, the necessary intent may be "'inferred from the facts and circumstances of the debtor's conduct.'"  *Id*. at 472-73 (quoting *Fox v. Schmit* (*In re Schmit*), 71 B.R. 587, 590-91 (Bankr. D. Minn. 1987)).  Here, the debtor's case has been pending for almost two years, affording her ample time to accurately

34

disclose all of her assets and income had she intended to do so.  It is apparent based on the facts and circumstances surrounding the debtor's conduct that she did not so intend.

When the debtor filed her initial schedules in this case on July 31, 2015, she failed to disclose her inherited interest in 1217 East 15th Street.  The debtor tried to justify this omission by saying that her mother had made it clear that the debtor was not to inherit or even share in the property with her siblings.  However, the debtor's actions relating to this property belie her alleged belief that she had no interest in it.  She has consistently used the address to receive her mail, she listed the address on her petition, and she has lived there both alone and with her son.  In addition, although she claimed that she was living elsewhere with a friend when she filed her petition, she identified neither the friend nor the address of her alleged residence as of July 31, 2015.  Further, the debtor did not testify to whom her mother directed the property to go and there is no evidence that any of the debtor's siblings are claiming to own the property to the exclusion of the debtor.

The debtor also failed to disclose in her initial schedules her liquor license and her bank account for Dokes Auto.  At trial, she offered no explanation for her failure to disclose these particular assets.  However, based upon the debtor's non-disclosure of her corporate ownership interests, discussed below, it is easily conceivable that the debtor intentionally concealed her liquor license and corporate bank account not only to hide the assets themselves, but because disclosing these items would have led creditors or the trustee to question why someone who had listed her only source of income as employment in "used car sales" would possess a liquor license or be a signatory on a corporate account. Further, the debtor failed to disclose her ownership of four corporations while simultaneously claiming that property owned by two of them–Dokes Auto and JNYLECO–was her own in order to delay Arvest's foreclosure efforts in state court. Although she tried throughout the trial to blame her omissions on Phillips and Martindale, there is no indication that either attorney knew the extent of her corporate interests–let alone advised her to refrain from disclosing those interests on her schedules. In any event, while "a debtor who acts in reliance on the advice of counsel can lack the

intent required to deny a discharge, reliance on advice of counsel is not a defense when it should be evident that the information should be included." *In re Killian*, 2008 WL 5834017, *7. In this case, it should have been evident to the debtor that the omitted assets should have been disclosed.

In addition, she tried to conceal the amount of equity in the properties that she disclosed by changing the property values and secured debt amounts to show negative equity of $38,402.00 in her July 31, 2015 schedules despite representing that the same properties had equity of $250,847.98 only fifteen months earlier when she filed her first case. At trial, the debtor failed to satisfactorily explain the basis for her devaluation of the properties.[25] On February 8, 2016, the debtor filed an amendment in which she manipulated the property values and secured debt amounts once more, this time to reflect slight equity of $6598.00 on the four previously scheduled properties and to disclose an additional property owned by JNYLECO at 704 West 18th Street with equity of $3000.00.[26] Because the debtor let her original schedules stand for seven months without trying to rectify even one of the numerous omissions contained within them, the Court finds it improbable that the debtor filed her February 8, 2016 amendment due to a sudden realization that she had made errors on her initial schedules that called for correction. Rather, the debtor's February 8, 2016 amendment appears to have been tailored to support the debtor's argument at the hearing the next day that a conversion to a chapter 7 would deprive the debtor of her equity in the properties–an argument that would have been difficult to make with the debtor's initially filed schedules showing no equity at all. Similarly, the Court finds that the debtor's motive for disclosing on February 8, 2016,

---

[25] The debtor attempted to explain the changes that she made to property values only as to 2500 East 2nd Street, testifying that she had previously listed the property at $86,000.00 based upon her belief that "the state has it listed for $86,000.00" but that she changed it to $35,000.00 because that is her "best guess" of what the property is actually worth. Trial Tr. vol II, 172-73.

[26] Arvest's witness testified on February 9, 2016, that this property had been razed.

36

that she had additional monthly income of $1000.00 from real estate earnings was not based upon the debtor's desire to correct her previous concealment of the income; rather, the Court finds that the debtor revealed her real estate income at this juncture in the case only because she needed to counter Arvest's allegation that her case should be converted to a chapter 7.  In its motion to convert, Arvest argued that conversion was appropriate because the debtor's Schedules I and J stated that she had only $540.00 available each month to make her $1500.00 proposed plan payment.  By adding $1000.00 in real estate income to her monthly budget, the debtor created a basis to argue at the hearing the next day that she could afford the proposed payment.[27]  For all of these reasons, the Court finds that the debtor did not file her February 8, 2016 amendment in a genuine effort to correct her prior omissions, but filed it in an attempt to recast her assets in the light that best accomplished her immediate goal of defeating Arvest's motion to convert.

Additionally, a debtor has a duty to update schedules as soon "as reasonably practicable" after becoming aware of any inaccuracies or omissions.  *In re Berger*, 497 B.R. at 62.  Yet, despite the debtor being made indisputably aware during the course of the February 9, 2016 hearing that her February 8, 2016 amendment had failed to rectify a number of omissions on her schedules and statements, the debtor did not file another amendment for eleven months–and only then on the literal eve of this trial.  In the debtor's January 18, 2017 amendment, she disclosed assets for the first time that included:  an additional $700.00 in clothing; an additional $9000.00 in the liquor license's value; 100% ownership of Lending Hand Foundation; $2300.00 in "net income from rental property and from operating a business, profession, or farm"; monthly rental income of $300.00 per month; and rental income of $1800.00 for the period of January 1, 2015 to July 31, 2015.

---

[27]  The debtor reduced her real estate earnings from $1000.00 to $155.00 in her January 18, 2017 amendment.

37

Based upon the number of assets that the debtor omitted, the implausible or nonexistent explanations for the omissions, and the suspect timing and content of the debtor's amendments–as well as for the reasons supporting the Court's finding of fraudulent intent under § 727(a)(4)(A), discussed below–the Court concludes that the debtor intentionally failed to list property that she owned in an attempt to hinder, delay, or defraud her creditors or the trustee.  The Court finds that Arvest proved each element of § 727(a)(2) by a preponderance of the evidence.  Therefore, the Court denies the debtor's discharge under § 727(a)(2).

### Section 727(a)(4)(A)

"Bankruptcy provides debtors with a great benefit: the discharge of debts." *Home Serv. Oil Co. v. Cecil* (*In re Cecil*), 542 B.R. 447, 454 (B.A.P. 8th Cir. 2015) (quoting *Ellsworth v. Bauder* (*In re Bauder*), 333 B.R. 828, 834 (B.A.P. 8th Cir. 2005) (Schermer, J., dissenting)).  However, "[t]he price a debtor must pay for that benefit is honesty and candor.  If a debtor does not provide an honest and accurate accounting of assets to the court and creditors, the debtor should not receive a discharge." *Id.*  The bankruptcy code "requires nothing less than a full and complete disclosure of any and all apparent interests of any kind." *In re Korte*, 262 B.R. at 474 (citation omitted).  When a debtor fails to comply with the code's disclosure and veracity requirements, it "necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole." *Nat'l Am. Ins. Co. v. Guajardo* (*In re Guajardo*), 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997).  "'A fundamental purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied for those interested in the administration of the bankruptcy estate on which they can rely without the need for the trustee or other interested parties to dig out the true facts in examinations or investigations.'" *In re Haynes*, 549 B.R. at 686 (quoting *Sergent v. Haverland*, (*In re Haverland*), 150 B.R. 768, 770 (Bankr. S.D. Cal. 1993).  To that end, § 727(a)(4)(A) provides for the denial of a debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account."  11 U.S.C. § 727(a)(4)(A).  A party objecting to a debtor's discharge under (a)(4)(A) has the

38

burden of proving by a preponderance of the evidence that–

> (1) the debtor made a statement under oath;
>
> (2) the statement was false;
>
> (3) the statement was made with fraudulent intent;
>
> (4) the debtor knew the statement was false; and
>
> (5) the statement related materially to the debtor's bankruptcy.

*In re Richmond*, 429 B.R. at 307.

The first and second elements under § 727(a)(4)(A) require that the debtor made a false statement under oath.  Debtors are required to verify their schedules and statements under the penalty of perjury.  *Daniel v. Boyd* (*In re Boyd*), 347 B.R. 349, 354 (Bankr. W.D. Ark. 2006).  The debtor testified that she and Martindale's assistant reviewed her petition and schedules page by page before the debtor signed them.  Trial Tr. vol II, 11.  On July 31, 2015, the day that Martindale filed the debtor's case, the debtor signed a declaration concerning her schedules that stated: "I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of 19 sheets, and that they are true and correct to the best of my knowledge, information, and belief."  The debtor signed a similar declaration regarding her SOFA that stated: "I declare under the penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct."  The debtor's declarations regarding her schedules and statements have the "force and effect of an oath."  *Id*. at 355 (citing *Cepelak v. Sears* (*In re Sears*), 246 B.R. 341, 347 (8th Cir. B.A.P. 2000)).  However, despite the debtor's declaration under the penalty of perjury that her schedules and statements were true and correct, they were rife with inaccuracies and omissions, a fact that the debtor admitted at trial–but one that she could not have denied plausibly given the extent of each of her two amendments.  Specifically, the debtor admitted that she did not initially list on her schedules and statements her inherited interest in 1217 Curtis Sykes Drive; her ownership interests in Dokes Auto, Lending Hand Foundation, JNYLECO, Jocelyn's Grille f/k/a Red Barn, Inc.; the fact that she had been an officer of all four corporations within the six years prior to filing; her use

39

of vehicles owned by Dokes Auto; her liquor license; or her April 14, 2014 transfers to Talesha. Additionally, according to the debtor's own testimony, she transferred a portion of her interest in Dokes Auto to Talesha at some point in 2014 prior to filing her first case on April 16, 2014. Even if the debtor transferred shares of Dokes Auto to Talesha on January 1, 2014, the transfer occurred within the two-year period preceding the filing of this case on July 31, 2015, and should have been–but was not–disclosed in response to SOFA Question 10.

As the Court previously stated above in its analysis of § 727(a)(2), filing an amendment after a creditor demonstrates the falsity of the original documents does not absolve the debtor of the ramifications of filing inaccurate documents in the first place. *In re Sholdra,* 249 F.3d at 382-83. In any event, despite having filed three sets of schedules and statements in the twenty-one months that this case has now been pending, the debtor has never accurately disclosed all of the relevant information. For instance, she has still not disclosed in her SOFA that she was president of Dokes Auto within the six years before filing, or that she was president of JNYLECO, Jocelyn's Grille, and Lending Hand Foundation at the time that she filed this case. She has also never disclosed in her SOFA that she transferred shares of Dokes Auto to Talesha in 2014. She has never disclosed in her SOFA that she drives vehicles owned by Dokes Auto. She has never disclosed on her schedules that she holds a real estate license. She has never disclosed on her schedules the substantial debt that she claims to owe Tony Woods. The debtor's initial schedules and statements did not disclose a liquor license at all. Her February 8, 2016 amendment referenced a "Liquor License at 1300 [sic] 145th Street" valued at $1000.00 under the heading "Schedule B: Personal Property." The debtor's January 18, 2017 amendment stated on Schedule A/B that Jocelyn's Grille owns a liquor license worth $10,000.00. However, the debtor has never disclosed on any schedule since the inception of this case that she personally holds a liquor license worth $10,000.00. For these reasons, the Court finds that the debtor made a false statement under oath, satisfying the first and second elements necessary to deny the debtor's discharge under § 727(a)(4)(A).

The third and fourth elements under § 727(a)(4)(A) require that the debtor knew that her statements were false and had fraudulent intent.  Whether the debtor had the requisite knowledge and intent under § 727(a)(4)(A) is a matter of fact.  *In re Sears*, 246 B.R. at 347 (citing *Palatine Nat'l Bank v. Olson* (*In re Olson*), 916 F.2d 481, 484 (8th Cir. 1990)).  In this case, the debtor has owned and run multiple businesses for the past twenty years.  She has taken business classes.  She has executed loan documents on behalf of herself, Dokes Auto, and JNYLECO.  She has drafted numerous deeds.  She has filed documents with the Arkansas Secretary of State on behalf of her corporations.  In addition to her various business endeavors, she owns rental property and is a real estate agent.  For all of these reasons, the Court finds that the debtor is relatively experienced in matters relating to business, finances, and real estate.  When the debtor's knowledge in these areas is viewed in concert with her admission that she reviewed each page of her petition and schedules before signing them, that she paid attention to the documents, and that she was aware of the information that had been provided to the Court, the Court finds that the debtor knew that the statements that she verified as true were actually false.  Nevertheless, the debtor denies that she intended for her schedules and statements to be inaccurate.

As stated above in the Court's analysis of § 727(a)(2), fraudulent intent may be "inferred from the facts and circumstances of the debtor's conduct."  *In re Korte*, 262 B.R. at 472-73 (quoting *In re Schmit*, 71 B.R. at 590).  Even if a debtor is merely careless, the "'cumulative effect of all the falsehoods together evidences a pattern of reckless and cavalier disregard for the truth to support fraudulent intent.'"  *In re Sholdra*, 249 F.3d at 383 (quoting *Economy Brick Sales, Inc. v. Gonday* (*In re Gonday*), 27 B.R. 428, 432 (Bankr. La. 1983)).  Therefore, reckless indifference to the accuracy of the information that the debtor provided in her schedules and statements is sufficient to prove intent.  *See In re Richmond*, 429 B.R. at 298.  Additionally, although a debtor's false oath in a previous case cannot serve as a basis for denying a debtor's discharge under § 727(a)(4)(A) in a later case, such "historical evidence" may be relevant to a determination of fraudulent intent in a subsequent case.  *In re Haynes*, 549 B.R. at 688

41

(citations omitted).  At trial, the debtor  argued that she did not have fraudulent intent in this case because she disclosed to Phillips all of the information required for accurate and complete schedules before filing her first case in 2014–but Phillips nonetheless made errors when he filed her 2014 case.  According to the debtor, Martindale perpetuated Phillips's errors by copying the debtor's 2014 schedules and statements and refiling the same information in this case.  The Court will address each facet of this domino-effect argument in turn–the debtor's allegedly complete disclosures to Phillips in her first case and Martindale's alleged duplication of Phillips's work in her second.

First, the Court finds that neither the intake form nor Phillips's testimony supports the debtor's assertion that she made the necessary disclosures to Phillips in her first case. The debtor's intake form from her 2014 filing with Phillips is replete with omissions and outright misrepresentations.  Despite driving a vehicle–or vehicles–owned by Dokes Auto, the debtor left blank the space after the question "Do you drive or have in your possession a vehicle/boat/ATV/etc that belongs to someone else (describe)."  Despite owning rental property at 2500 E. 2nd Street and a share of inherited property at 1217 Curtis Sykes Drive, the debtor wrote nothing after the question asking the debtor to "Please list below any real property or time shares you own other than the home you live in."  Despite owning stock in Dokes Auto, JNYLECO, Lending Hand Foundation, and Jocelyn's Grille, the debtor answered "no" to the question "Do you own any stocks (either publicly traded or closely held) or bonds.  She provided no information to the next question asking the debtor to "please describe the stocks/bonds, your number of shares and who manages them, or *if of a business that you own, please describe the business*[.]" (emphasis added)  Under the income section of the intake form, the debtor indicated that she was paid monthly–ostensibly from her employment at the car dealership–but made no reference to her real estate commissions or rental income next to the question asking the debtor to state the sources and amounts of "other income."  Further, the "property transfer" section of the intake form contains only a cryptic reference to a transfer of the 145th Street property to the land commissioner on a date unknown.  What the intake form does *not* contain is so much as a hint that the debtor transferred the 145th Street property

42

to Talesha within hours of her consultation with Phillips.[28]  Although Phillips testified
that he knew about a possible transfer involving the land commissioner, nothing in his
testimony indicates that he knew about the debtor's transfer to Talesha at any point in his
representation of the debtor.

Second, the Court finds that Martindale did not merely duplicate the debtor's 2014
schedules and statements when he filed the debtor's second case.[29]  In fact, the Court
finds that the documents filed by Martindale in this case deviate substantially from the
debtor's 2014 filing, supporting the debtor's testimony that she and Martindale's
assistant did, in fact, make changes to the debtor's 2014 schedules before Martindale
filed her 2015 case.[30]  The second case contains several alterations that include: changing

_____

[28]  The Court has no evidence regarding which event occurred first on April 14,
2014–the debtor's consultation with Phillips or her transfer of property to Talesha.
However, if the debtor consulted Phillips before she drafted the deed to transfer the 145th
Street property to Talesha, she should have disclosed her ownership of the property on
Phillips's intake form in response to the specific question seeking a list of the debtor's
property "other than" her residence because on April 10, 2014, the delinquent taxes on
the property were paid and the land commissioner conveyed the property to the debtor.
Alternatively, if the debtor consulted Phillips after she drafted the deed to Talesha, she
should have disclosed that fact under the property transfer section of the intake form.  In
any event, there is no question that the debtor transferred the property to Talesha well
before Phillips filed the debtor's SOFA on April 23, 2014, that contained the debtor's
verified statement that she had made no transfers in the prior two years.

[29]  As for Martindale's alleged culpability for the omissions and inaccuracies in
this case, a "'blame the lawyer' defense will rarely be successful where sophisticated
debtors are involved, as the [debtor is] in this case.  The defense has virtually no chance
to succeed where an otherwise available target attorney is not called as witness."  *In re
Bauer*, 291 B.R. 127, 131 n.3 (Bankr. D. Minn. 2013).  The debtor did not call
Martindale as a witness, further weakening an already precarious defense premised upon
not one but two attorneys failing to disclose clearly relevant information in two separate
cases.

[30]  The debtor recounted varying versions of the process by which she and
Martindale readied her second case for filing.  In one version, the debtor denied that she
provided any new information to Martindale and  asserted that Martindale filed exactly
the same information as Phillips had filed in her prior case.  Trial Tr. vol II, 16.   In the

the debtor's title at "Quality Auto Sales" from manager to "used car sales;" deleting income from "rental property and operating a business" on Schedule I; deleting rental income from the debtor's SOFA; disclosing the pending state court lawsuit filed by Arvest; disclosing that Everhome Mortgage had foreclosed on 6 Cedar Creek Court; and the total devaluation of four properties that the debtor's 2014 schedules had shown as having equity of $250,847.98.  For all of these reasons, the Court finds that even if Martindale used the debtor's 2014 schedules and statements as a starting point for the preparation of the debtor's second case, he did not deprive the debtor of an opportunity to provide new information and rectify the errors and omissions present in the debtor's prior case.

The Court finds that the debtor did not avail herself of that opportunity.  Even if the Court believed that Martindale had prepared the debtor's schedules and statements in this case by using the exact same information as Phillips had filed in the debtor's 2014 case, the debtor unequivocally testified  that she reviewed her schedules and statements in this case prior to Martindale filing them.[31]  If the debtor had truly disclosed the relevant information to Martindale–or Phillips before him–and Martindale nonetheless failed to put the information on her schedules and statements, the debtor should have pointed out the omissions to Martindale before he filed her case.  *See Kaler v. McLaren* (*In re McLaren*), 236 B.R. 882, 898 (Bankr. D.N.D. 1999) (even if mistakes originate in an attorney's office, the debtor is not absolved from the duty to personally ensure that information  provided to the court under the penalty of perjury is accurate).  Here–again,

---

version that the debtor advocated at the February 9, 2016 hearing on Arvest's motion to convert, the debtor said that she reviewed her schedules and statements *with Martindale* prior to the filing.  Mot. to Convert Hr'g Tr. 55.  In a third version, the debtor testified that she never reviewed the documents with Martindale, but acknowledged that she did review them with his assistant.  Trial Tr. vol II, 10-11.  Because of the debtor's inconsistent testimony, the Court affords it little evidentiary weight.

[31]  As the Court noted previously, the debtor sometimes testified that she reviewed the information with Martindale and sometimes testified that she reviewed it with his assistant, but she never testified that she did not review it at all.

assuming for a moment that the debtor disclosed all of her assets and transfers to either attorney and Martindale failed to list them on her schedules and statements in this case–the debtor apparently opted to interpret Mardindale's omissions as tacit legal advice that information patently responsive to the questions asked of her should be hidden from her creditors, the trustee, and the Court.  However, "advice of counsel to the effect that property which the [debtor] undoubtedly owned was not required to be scheduled was not an acceptable defense for failure to schedule the property since such advice related to a plain, palpable and transparent fact."  *Barnett Bank of Tampa v. Muscatell* (*In re Muscatell*), 113 B.R. 72, 75 (Bankr. M.D. Fla. 1990).

The debtor also argued that her omissions and inaccuracies were not the product of any fraudulent intent, but instead occurred because she failed to understand all of the terms contained in the questions on the schedules and statements.  The debtor testified that she relied on Phillips and Martindale to answer her questions, and, although there is no evidence before the Court that the debtor ever asked either attorney a single question aimed at clarifying an unfamiliar term, she acknowledges that she could have done so.  Additionally, the only specific term that the debtor said that she did not understand was the word  "priority" in the context of tax claims.  She did not testify to any additional terms that she found to be perplexing.  Because of the debtor's experience in real estate and business matters, as discussed in detail above, the Court finds it inconceivable that the debtor was genuinely confused about questions relating to her business interests, property ownership, or transfers of property.  As another bankruptcy court found when faced with similar facts, the Court finds that the debtor's contention that she is "an unsophisticated individual who is unable to understand the meaning of questions on the Statement of Financial Affairs stated in plain English flies in the face of common sense and every-day experience of anyone with even a minimum of business savvy and experience."  *In re Muscatell*, 113 B.R. at 75.  For all of these reasons, as well as those stated above in relation to the Court's finding that the debtor possessed the requisite intent under § 727(a)(2), the Court finds that the debtor had fraudulent intent under § 727(a)(4)(A).

Finally, the Court finds that the debtor's false statements related materially to her bankruptcy.  In order to warrant the denial of the debtor's discharge under § 727(a)(4)(A), the debtor's false statements must be material to her bankruptcy case.  *In re Richmond*, 429 B.R. at 307.  "A false statement is material if it 'bears a relationship to the [debtor's] business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of [her] property.'"  *In re Mathis*, 258 B.R. at 736 (quoting *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992)).  If each of the debtor's numerous false statements could be viewed in isolation, perhaps not all of them would be material.  However, when the debtor's false statements are viewed as part of the broader landscape of this case, their effect is cumulative and they are material.  *See Mosely v. Sims* (*In re Sims*), 148 B.R. 553, 557 (Bankr. E.D. Ark. 1992).  Further, the debtor made numerous false statements that are alone sufficient to warrant the denial of her discharge under § 727(a)(4)(A).  She failed to disclose her interests in Dokes Auto, JNYLECO, and Jocelyn's Grille, she failed to disclose her transfers of unencumbered property to Talesha;[32] she failed to disclose that she had been an officer of four corporations within the six-year disclosure period; she failed to disclose her interest in 1217 East 15th Street, she claimed to own three properties that were not hers in order to thwart Arvest's foreclosure; she failed to disclose her liquor license and her real estate license; she failed to disclose her rental income and real estate income; and she failed to disclose her Dokes Auto bank account with a $4000.00 balance.  These false oaths go directly to the heart of the debtor's business transactions, the discovery of the debtor's assets and business dealings, and the existence and disposition of the debtor's property.  The Court finds that Arvest proved each element of § 727(a)(4)(A) by a preponderance of the evidence and also denies the debtor's discharge pursuant to § 727(a)(4)(A).

---

[32]  Because a determination of whether the debtor received sufficient consideration from Talesha in exchange for the 145th Street and Dineen properties has no bearing on the debtor's duty to disclose the transfers on her SOFA, the Court reserves its ruling on that issue for the trial of the trustee's adversary proceeding.

**Conclusion**

For the above stated reasons, the Court finds that the elements of § 727(a)(2) and (a)(4)(A) have been met.  The Court denies the debtor's discharge pursuant to both sections.

IT IS SO ORDERED.

Ben Barry
United States Bankruptcy Judge
Dated:   05/02/2017

cc:    Lyndsey D. Dilks, attorney for the debtor
       Branch R. Fields, attorney for Arvest
       M. Randy Rice, chapter 7 trustee
       United States Trustee